# IN THE COURT OF APPEALS OF IOWA

No. 13-1640
Filed September 10, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CHICO NEWMAN,**
        Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Des Moines County, John G. Linn,
Judge.


        Chico Newman appeals his conviction for first-degree murder.
**AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Theresa R. Wilson,
Assistant Appellate Defender, for appellant.

        Chico Newman, Fort Madison, appellant pro se.

        Thomas J. Miller, Attorney General, Kevin Cmelik and Sharon K. Hall,
Assistant Attorneys General, Patrick C. Jackson, County Attorney, and Lisa K.
Schaefer and Tyrone Rogers, Assistant County Attorneys, for appellee.


        Heard by Tabor, P.J., and Bower and McDonald, JJ.

**BOWER, J.**

Following a jury trial, Chico Newman was convicted of the first-degree murder of his wife, Crystal Newman. Chico's primary defense theory was Crystal committed suicide after they argued over her infidelity. Alternatively, he claimed Crystal's paramour, Joshua Patrick, killed Crystal. On appeal, Chico claims (1) the State presented insufficient evidence to convict him and (2) the district court abused its discretion in allowing officers to testify to other suicide scenes involving women and firearms. In a pro se brief, Chico raises additional claims. We affirm the conviction.

## I.  Background Facts and Proceedings

Crystal and Chico lived in Burlington, Iowa. At the time of her death in the early morning hours of August 9, 2012, Crystal and Chico had been married fourteen years and had two children, T.N. and N.N., ages nine and eight.

Crystal's mother, Jean Johnson, was divorced from Crystal's father, Ron Johnson. Jean testified, after Crystal and Chico were married, Chico restricted Crystal's communication with Jean. In 2010 Jean sent Crystal a card for Mother's Day; in response, Jean received a hostile phone call from Chico, who told her "it was his family, and that it was not [Jean's] business to be looking for them, contacting" Crystal. Chico "was just quite angry that I was doing searches" and told Jean "there would be consequences for [her] actions" if she continued contacting Crystal.

In contrast, Ron testified he had a good relationship with Chico. However, Ron did not get to see Crystal as much as he would have liked after the couple

married, and she was quieter when Chico was with her. Ron also testified, when Crystal was visiting by herself "she received a lot of phone calls from Chico just wanting to know where she was and what she was doing." Ron explained Chico would call Crystal "every couple of hours," which was "a bit much."

In 2010 Crystal started working as a shift manager at a Burlington McDonald's. Kathleen Armstrong testified Crystal was her trainer and mentor at McDonald's. Armstrong saw Crystal on the evening she died and testified Crystal was "just happy, thoroughly happy." Joshua Patrick also worked at McDonald's. During the summer of 2011, Patrick started seeing Crystal outside of work while Chico was away and after the children had gone to bed. Patrick would come over and talk to Crystal on her enclosed sun porch. Once during the winter months, Patrick went inside and used the bathroom but that was the only time Patrick was inside Crystal's house. After about six months, a physical relationship developed between Patrick and Crystal, which led to sex on the sun porch during the spring and summer of 2012.

Kristen Huber, Crystal's friend since high school, testified after Crystal married Chico she was less outgoing and more paranoid if he was around. Approximately six months before Crystal died, Huber and Chico had their only "one on one" conversation when an angry Chico left a message on Huber's phone and she returned his call. Chico expressed his unhappiness that Huber "was talking to Crystal," and told Huber he had blocked Huber's number from Crystal's cell phone. During the conversation, he eventually calmed down, and by the end of the conversation, he had agreed to unblock Huber's number.

Huber knew Crystal was having a relationship with a coworker but did not know the coworker's name. Because Chico checked Crystal's phone records, Crystal provided Patrick's cell number to Huber and arranged for Huber to be the intermediary and send text messages to Patrick's cell phone. Huber explained Crystal would text her to, "tell him to come over or tell him not to come over."

Meanwhile, in February 2012 Chico started an online relationship through a date-hookup site with Lynsey Surridge, who lived in the state of Washington. After about one month, Lynsey and Chico were exchanging daily text messages and phone calls. According to Lynsey, their conversations eventually got more serious. Despite the fact they had never met in person, Lynsey and Chico started talking about a future relationship and "being together." At trial, Chico admitted he did not tell Lynsey he was married and had children.

Chico worked in Texas during the summer of 2012. In early July 2012, about one month before Crystal's death and while he was driving from Texas to Burlington, Chico called Crystal's father. Ron testified Chico was very upset and told him he believed Crystal was having an affair. When Ron stated he did not know anything about an affair, Chico replied, if it were true, "there would be consequences."

About two weeks before her death, Crystal told Patrick she was contemplating a divorce. Patrick heard Crystal's side of a phone call and also overheard Chico saying "he just wanted the money and didn't care, that's all he wanted." At trial, Patrick, who was younger than Crystal, denied having any future plans with her.

Twelve days before she died, Crystal called Jean, stating "she was so sorry," she loved Jean, she was "going to discuss divorce with Chico, and we've already discussed it over the phone, but I'm going to tell him that it's going to happen." Ron watched the kids over a weekend so Crystal could discuss a divorce with Chico. Ron was concerned about Chico's potential reaction, so he asked Crystal if he should go with her for the discussion. Crystal replied, "No. That would just cause more trouble." According to Ron, when Crystal returned to pick up the kids, "she was happy, because Chico said that, you know, they could start a divorce, and he [wanted] to work on the marriage."

Six days before she died, a "very happy" Crystal called Jean and told her "she would be calling [Jean] as least once a week to check in and see how things were going." They discussed getting together for T.N.'s birthday the next week or getting together soon after the birthday.

On August 2, 2014, Crystal met with Burlington attorney William Monroe III to discuss a divorce. Monroe observed Crystal was "extraordinarily focused" and determined to obtain a divorce. Crystal was adamant about having physical care of the children and wanted to keep Chico's child support payments low. Monroe formed the impression Crystal had discussed the divorce with Chico and he had acquiesced.

A few days before August 8, 2012, Crystal told co-worker William Hoskins she was getting a divorce. On August 8 Crystal asked Hoskins to help her find a new residence because "she was just leaving. She couldn't do it anymore. She needed a new place to live." Hoskins promised to bring information to work the

next day. While at McDonald's, Crystal also talked to Patrick. They agreed to meet that evening.

At trial, the children testified to going upstairs to their bedrooms between 8:30 and 9:00 p.m. N.N., whose bedroom is closest to the stairs, heard doors opening and closing after he went to bed. N.N. thought someone could be in the house. When N.N. went downstairs to tell his mom about something he had heard on the radio, he saw the door to the dining room was shut and thought it odd. N.N. went back upstairs and fell asleep. N.N. woke up and saw his dad walking up the steps around 11:00 p.m. N.N. said hello, and Chico replied. N.N. testified he could see into the upstairs bathroom and saw Chico taking a shower while Crystal folded laundry in the bathroom.[1] N.N. fell back asleep, and he did not hear his parents arguing or hear any loud noises.

Crystal texted Huber at 11:24 p.m. on August 8: "Tell him not to come; he is home." Huber then forwarded one last text message to Patrick, "do not come over." Because Patrick had fallen asleep, he did not see the message until the next morning.

Crystal was alive when McDonald's coworker Desirae Hobbs briefly spoke with her on the phone at 12:45 a.m. on August 9. Before 2:30 a.m., Chico was outside his house telling the police that after Crystal "cut him," he left for the hospital at 1:36 a.m. T.N. is a heavy sleeper. She testified she did not know her father was home until he woke her up around 1:45 a.m., saying they had to go to the hospital because Crystal had stabbed him in the arm. T.N. stated Chico took

---

[1] At the top of the stairs, the bathroom was on one side and N.N.'s bedroom was on the other side.

them downstairs; they put on their shoes in the kitchen and left through the kitchen door, still wearing their pajamas. T.N. and N.N. did not see or hear their mother as they were leaving, and both testified the kitchen light was on. T.N. also testified: "Q. Did you notice anything unusual in the kitchen? A. That mom didn't say anything, since her bedroom is, like, so close that she probably would have heard us and said something, but she didn't."

Chico used a key to lock the deadbolt on the metal kitchen door after he rushed out with the children. Exhibit G, a photograph of the wooden front door, showed the front door's deadbolt was activated when the officers forced it open to enter the house.

During the car ride to the hospital, Chico told T.N. that he and Crystal had a big fight over a love letter from someone. T.N. believed her father tried to call Crystal on the way to the hospital but did not get an answer. Around 2:00 a.m., they all entered the hospital emergency room, and Chico said he had been in a domestic altercation with his wife, expressing concern over her welfare. As a result, hospital clerk Michael Tweed called the Burlington police and requested a welfare check at the home.

Dr. James Vandenberg and nurses Virginia Caulley and Brennan Garrison treated Chico, and he told them he was taking a blood thinner for a blood clot in his leg.[2] He kept his kids close to him, appeared anxious, and made phone calls during his treatment. Vandenberg heard Chico telling someone about learning

---

[2] Dr. Vandenberg testified Chico had a nine centimeter open laceration across his left arm, no more than one-quarter inch deep, and without much bleeding. Using seven staples, Vandenberg closed the wound.

his wife was having a relationship with another man, he was upset over finding a note, and his wife was upset and depressed. Caulley heard Chico talking to his mother, stating, "I can't believe she did it." Garrison heard him repeating, "I have proof." Crystal's father testified Chico called at 2:10 a.m. and briefly stated he was at the hospital, he and Crystal had fought, and Crystal had stabbed him. Ron immediately called Crystal but was unable to reach her. After treatment, a nurse took Chico and his children to a different room to wait for a police officer to talk about the domestic assault allegations. Without completing the discharge process and without telling anyone, Chico took his children and left the hospital.

**A. Investigation.** Meanwhile, Burlington officers Dale Wyatt and Ronald Gerdner were sent to Crystal and Chico's home to do a "welfare check on a person that may be suicidal." After finding the doors locked and receiving no response to loud knocking, they looked in the windows and observed a woman on the floor. After their forced entry through the locked front door, the officers found Crystal on the bedroom floor with blood pooled around her head and a semi-automatic pistol in her *left* hand.[3] Officer Wyatt commented, "this gal shot herself." The officers called Sergeant William Venvertloh for assistance and secured the house. Subsequent investigators found a green bath towel, later determined to have Crystal's blood on it, on the countertop by the kitchen sink. The investigators also found a crumpled note, later determined to have Crystal's blood on it, diagonally across the kitchen on the countertop by the stove.

---

[3] At trial, Crystal's father testified she is right-handed.

The officers called clerk Tweed, seeking Chico's location and telling Tweed they had found a woman on the floor. Tweed then called Chico, warned him not to take the kids inside the house, and stated the police were there. Tweed testified he thought he heard sobbing.

Police dispatcher Mary Watkinson also called and told Chico to go directly to the police station, not to his house. Chico agreed to do so. Gerdner left the house for the police station to interview Chico. However, Chico lied to Watkinson, telling her he was driving a blue Chevrolet Cobalt when he was actually driving a beige SUV, which he drove directly home and parked in the garage. Chico got out of his car, shortly before 2:30 a.m. When he saw officer Wyatt, Chico got back in his car and backed out into the street, only stopping when Venvertloh approached. Venvertloh discovered the car's driver was Chico and radioed Gerdner to return to the house. Venvertloh obtained Chico's contact information and explained he was investigating Chico's domestic allegations. Thereafter, Chico spoke with Gerdner for about fifteen minutes while sitting in his car with the children.[4] Gerdner asked Chico to start from the beginning, and Chico repeated his story several times.

Chico stated he had been working in Texas and was supposed to come home on the upcoming weekend, but instead, he had driven nineteen hours straight as a surprise. When he arrived between 11:30 p.m. and midnight, "the man she had been seeing while I been gone pulled off." "I parked in the garage and . . . gave her some time to get herself together." Chico went inside and

---

[4] The video recording was played for the jury.

found Crystal "on the porch, smoking weed." He surprised Crystal, said, "I'm home," and they talked. He went "upstairs to take a shower. I come down, there's a letter she wrote to him [the man she had been seeing]. So I picked the letter up and I started reading the letter." Crystal came back in from doing her "little McDonald's paperwork." "I said, 'What's this letter here about?' She tried to snag it from me . . . . She said, 'You're not here so don't worry about it.' So I took a picture of the letter" to show her father.

Chico stated he told Crystal, "I'm going to show your dad since you say you want a divorce from me because I'm never here . . . but yet you're sleeping around and say I can't prove it and now I got documentation of it." Chico showed the cell phone picture to Gerdner, who could see writing, explaining: "I said I was going to show [her father] this. I found this in our room." She "snatched it from me. Grabbed a knife and slashed my arm. I grabbed my kids." Gerdner interrupted to ask about his injury, and Chico described the staples in his arm before continuing: "When I said I was going to show her dad, she took" the letter "from me," saying "'I'm going to kill myself,' and I grabbed the kids and I ran to the hospital." When he left, Crystal had the letter with her.

Chico asked Gerdner, "Have you guys been in the house? . . . Obviously something's going on [be]cause everyone won't let us up in the house." The officers asked him what kind of knife Crystal used. Chico replied:

> She grabbed a steak knife out of the kitchen. I had the letters and I was reading the letters and I was walking and she kept trying to snatch them and I said, "Let me read them. I will give them back to you if you tell me what all this is about." I read the letters and I gave them to her. And as soon as she got them from me; she went

to cutting on me. I ran and grabbed the kids and I got right out of there.

Chico then addressed the children in the car: "Didn't I tell you, 'Let's go.' And you said, 'Let me go in there and talk to mama.' And I said, 'she cut me.' And then we left the house, isn't that what we did"? Gerdner asked whether Crystal was right-handed or left-handed, and Chico replied, "I think she's right-handed. I think. I . . . I . . . I . . . don't know for sure, I'm on a bunch of medication right now. I can't really tell you." He described his various medications.

When asked "who" had left the house, Chico replied, "[Crystal] wouldn't give me a name, and I happened to find it in the room." When asked to describe the car, Chico thought it looked "like a Buick. I just parked in the garage and I let her do her thing and then I moseyed up in the house and surprised her" after giving her "time to act like nothing happened." Crystal had a gun with her on the porch because she thought she heard somebody whistling. "I surprised her."

Chico asked if Crystal was okay. After a pause, the officers replied: "This is all about a stabbing." Chico then volunteered more details: "I found a letter my wife wrote to this man that just left my house . . . . I confronted my wife with it . . . . She would not tell me who this letter was to." She got upset when I talked about showing her dad.

> I know she's messing around. She paints this picture that she would never do that and . . . I was going to show her dad and she wanted the letter from me. I did not want to give her the letters. I had the letters in my hand, reading the letters to her. I said I'll give them to you when I'm done reading it. The moment I was done reading I gave the letters to her.

"She started tearing one up . . . she had the letter and the steak knife and cut me." "We were in the bedroom; I was in the doorway when she f*** cut me." Crystal "did not want me to have that—evidence she was doing somebody, it's a smoking gun."

Chico added, Crystal came upstairs and started doing laundry while he showered. He again addressed the kids: Remember you said, "Dad, you're home," and we hugged. "Then I went back downstairs and put some clothes on. I grabbed the letter and started reading it. She came back in and . . . brought the gun in . . . . I said . . . 'Who is this letter to?' So I read it to her. The more I read the madder she got." While reading, Chico walked to the kitchen. Crystal followed and stood "with her arms crossed," "looking at me." Crystal "reached for something in the kitchen, and I didn't pay no mind; I didn't think she was grabbing something. And the moment we get in the bedroom she f*** starts cutting on me." "It was evidence . . . a smoking gun. She was cheating on me."

Chico again spoke to his kids: "We left, what, about 1:36"? Then he checked his mileage and estimated he arrived home around 11:30 p.m. He repeated, "She didn't know I was coming. I was going to surprise her. And lo and behold I come here and there's a man leaving my house. And I got the letters. I showed you the letters on my phone . . . . I know she's got the letters in there with her." Chico stated he had friends in the police department and asserted: "This is a crime scene here. You guys need information from me to see if I did this or if she did this. Now, there's evidence . . . I seen a man leave. She was devastated. My wife was smoking drugs." "I started working

construction and traveling and . . . she starts seeing people . . . and I come home tonight and I see a man leaving, and I knew something was happening."

When the officers asked for a name, Chico replied, "I don't know who he is. She wouldn't tell me." When the officers asked for more details about the car, he replied, maybe a Buick, maybe a '92 or '93, maybe a brown color, maybe a Crown Vic. He reiterated, "I caught her. I stayed calm and she cut me." When the officers asked if Crystal previously had assaulted him, Chico claimed she had "choked him." He then volunteered that two weeks ago, Crystal wanted to talk "so he came home. She took the kids to her parent's and said she wanted to leave me . . . . I said, 'Is there someone else?' She said, 'No, there's no one else.'" He told her, "You're lying. I know there is." Crystal then tried to choke him.

The officers explained: "In the State of Iowa, when somebody uses a knife to cut somebody then somebody has to go to jail." Chico replied: "Okay. So are you taking me to jail?" The officers stated they were not because she "stabbed you is what you're telling us." Chico then asked if he could talk to Crystal. The officers replied, Crystal is "not coming out here to talk to you. If she stabbed you she is going to jail." He then repeated: "Is my wife okay?" The officers responded, "Why would your wife not be okay?" Chico sighed and stated: "My wife cut me and my wife said she was going to hurt herself. Is my wife okay is what I'm asking you. I told the hospital the same thing." The officers stated other officers were trying to get Crystal's side of the story. The officers asked Chico if Crystal had said *how* she was going to hurt herself. He replied:

> Well, she had a knife and she had a gun in there, and I don't know . . . I mean, you tell me. It's pretty obvious. Your husband catches you with another man leaving this house and catches this letter. It's pretty obvious. It's like the end of the world to me now, I was devastated.

Chico stated Crystal kept a gun, a ".45," by the bed. He again tried to get information about Crystal:

> Come on you've been in our house . . . . We've been calling and calling, and she's not answering the phone . . . . The hospital told us that the ambulance was here,[5] and I don't see any ambulance here. So you guys are not telling me everything . . . . Is my wife okay or not?

At one point Chico also told the officers, he thought "this is a ruse. You got all these cops here, it's a crime scene."

The officers moved out of Chico's hearing to have a discussion. For several minutes they discussed whether to tell Chico that Crystal was dead. Chico broke up the discussion when he and one child got out of the car. The child waited by the car while Chico walked forward on the lawn, gesturing and talking to another officer. When the audio returned, the child said, "I can hold it." Chico replied: "No, I want you to use the bathroom. This is our house and no one is gonna bar us from it." When the officer told Chico not to go inside, he replied: "Are you going to arrest me or something? Did I do something?" The officer stated: "No, I'm not going to arrest you unless you want to go in that house." The officers asked Chico to come to the police station for photographs of his injuries and to give a recorded statement. He agreed and drove to the police station with Gerdner following.

---

[5] The officers were unaware of Chico's conversation with Tweed.

Burlington Detective Eric Short was called in to interview Chico, and while Gerdner briefed Short, Chico and his children waited in the lobby. After about twenty minutes, Chico and the children unexpectedly left. When Gerdner was alerted, he and other officers followed and stopped the SUV. Chico stated he was going to the hospital to get treatment for the blood clot in his leg. The officers called an ambulance. Chico gave himself an injection, refused further treatment, and drove back to the police station with his kids, who slept in a nearby conference room while Short interviewed him.

The first forty-five to sixty minutes of the interview were inadvertently not recorded. According to Short, during the unrecorded portion of the interview Chico provided additional details. Chico and Crystal talked about the drive; he "didn't bring up who had just left the residence." Throughout the "entire incident," the gun was always with Crystal. After Chico found the note, he and Crystal were both sitting on the bed while he read it to himself. He got up and went to the kitchen, continuing to read the note, and Crystal followed. As Chico left the kitchen to go back to the bedroom, he heard clanking in the kitchen, and given the time to think about it, "there [were] alcohol bottles next to the knife block on the kitchen counter." Crystal followed him back to the bedroom, and he asked her who this is. Crystal refused to give a name. He stated, "If you tell me, I will give you one of the notes back." Chico gave one page to Crystal; who then cut him with a steak knife.

Chico asked about Crystal, and Short told him, "Crystal is no longer with us." According to Short, Chico had a "small emotional reaction" and put his head

in his hands, making crying sounds for about one minute. Short photographed Chico's injury and collected various swabs. Short and Chico went out to Chico's truck, and Chico gave him the receipts from his trip. Chico gave Short the clothes he was wearing. When Short left to get bags for the clothing, he realized the recording was not on and activated it.

The video showed Short returning to the interview room and putting the clothes in the bags.[6] Chico initially stated Crystal was calm and cool. Short asked if the officers would find blood in his truck. Chico stated when he went upstairs he grabbed a shirt but he did not wear the shirt when he left for the hospital; his truck might or might not have some blood in it because he tried to protect the leather. He did not hold anything against the cut as he drove away. He grabbed a tissue at the hospital and held it against the cut. He dropped the tissue in the hospital's hallway. He put on the shirt he had grabbed after he was "sewed up." Chico repeated he heard the bottles clanking in the kitchen when Crystal was "messing with the knives." At one point Chico stated: "I told you what happened word for word."

Chico stated the last time he saw Crystal was when he left to go upstairs and get the kids.[7] Crystal was alive, and "we all left together." When asked why he did not call for an ambulance after Crystal cut him, Chico explained: "I'm taking blood thinners. I have a blood clot. I drove a long way. I didn't want to

---

[6] The video was played for the jury.
[7] Later in the interview, Chico changed his story. The last time he saw Crystal was when he left the kids in the kitchen and went in to grab his car keys from the entertainment stand.

wait around in case something happened to me and then there'd be two of us down. I'm not going to do that. I hurried up and went to the hospital."

Chico explained they did not scream and yell during their argument because they didn't want to wake the kids.[8] Short suggested someone in his position would be infuriated. Chico responded he stayed calm because he practices Buddhism and meditates. He also stayed calm because he had a smoking gun—the letter. This "infuriated" her and "made her angry." Chico stated Crystal was "distraught" because he "had seen her lover leave." "We had a great marriage." She was also upset because his calmness "pissed her off."

At one point Chico stated: "If the evidence doesn't point the way it should and it points to me, my children are going to be without their dad and my mom is going to have to raise my kids."

Short left the room to take the bags to his office. Although the officers at the house had asked Chico to give a recorded statement, Short had not told Chico he was video recording their conversation. The video showed, while Short was gone, Chico reached up near the ceiling, said, "Hi camera," and then the sound stopped. The video continued, however, and showed Short reentering the room. After an unrecorded discussion, Short and Chico moved to a second room with both video and sound. Short stated the police were getting a search warrant for Chico's cell phone and truck to see if there is evidence in the truck. Chico complained he was "getting railroaded" but eventually gave his phone to Short,

_____

[8] N.N.'s bedroom is directly above his parent's first-floor bedroom while T.N.'s bedroom is toward the front of the house. T.N. had to walk through N.N.'s bedroom to get to her bedroom.

protesting he was being held "longer for no reason." "I'm not leaving town. I know the procedures." Iowa Department of Criminal Investigation (DCI) agent Matthew George joined the interview, explaining attorneys had required the officers get a search warrant for the truck.

Chico had repeatedly asked to see his kids. Short and George took him to the room where the children were sleeping. Chico woke them up and asked if their mom was alive when they had left the house; they said she was.

When Chico and the officers returned to the interview room, Chico asked, "Are you charging me?" The officers said they were not but they did not want to lose any evidence in the truck. Chico replied, "Sometimes the evidence is false." "With the truck you are just wasting time."

Short asked Chico to describe the way his arm was bleeding after he was cut. Chico said the warm blood was running down his arm and dripping on his pants and foot. When Short stated they were surprised to find no blood at all in the truck, Chico responded he tried to take care of the truck, he had his elbow resting on his knee, and his bleeding arm was within his body. Also, the blood started "drying or coagulating" as he drove to the hospital. Chico repeated he had not held anything from home on the cut, although he had grabbed a black shirt from upstairs when he went up to wake the kids. Chico stated he did not put the black shirt on until after the doctors had treated him.

Chico claimed Crystal was upset and very angry when she cut him. Also, she knew he was leaving.

Chico gave varied answers regarding why he took the time to lock the back door with the key in his rush to get treatment. First, he stated he locked the door because they "teach the kids to always lock the door." Then he stated he locked the door because he did not want anyone coming in while he was gone. Short replied, "Crystal was there wasn't she?" Chico responded he did not want Crystal coming out after him. Chico did not arm the home security motion detector when he left.

Chico told Short and George that he came downstairs from the shower wearing a green towel. After sitting on the bed and reading some of the note out loud to Crystal when she joined him in the bedroom, Chico walked naked to the kitchen, reading the note to himself. He left the towel somewhere in the bedroom but could not remember where. Crystal followed him to the kitchen and started doing the dishes. Crystal fed the fish. Chico stated he did not give Crystal any part of the note in the kitchen but gave her one page in the dining room as they went back to the bedroom. Crystal told him everything was right there in the notes and "that's when the cutting started."[9] Crystal cut him as he walked in the "bedroom doorway." He then put on his shorts.

Short asked what Crystal was doing after she had cut him and while he was finding the shorts, "She still had the knife, didn't she?" Chico replied Crystal was just sitting there, tearing up one of the letters and just looking at me

---

[9] When asked if there was any reason they would find his fingerprints on the gun or knife, Chico stated Crystal had him cock the gun before he left for Texas and put the safety on so that all she would have to do is pull the trigger because she had a hard time "pulling that thing." Chico sharpened all the knives for Crystal, so even if a knife was clean it might have his fingerprints on it.

"because she couldn't believe I had found this and exposed her, it was a smoking gun." She "wasn't yelling, she was just so laid back, so laid back the whole time, that's what got me." Chico stated, "Crystal was tearing the evidence up because she did not want anyone to see it." When he left, Crystal was not bleeding and she had all the notes.

Short suggested a scenario, if there is a note in another part of the room, how does it get there? Chico replied, when Crystal was tearing up the note, he saw a name and wondered who it was. Chico grabbed a piece of the note as Crystal was tearing it up because he wanted to see the name. "That's why I know a piece of the note could be in the kitchen, because I was reading that note." Chico also stated, while Crystal was tearing up the first page in the bedroom, he took the other pages and that piece to the kitchen to read. But at that point, Crystal had not cut him. After Crystal cut him and he went to the entertainment center to get his keys, Crystal was sitting on the edge of the bed, just looking at him with one note shredded on the floor and the other two in her hand. That was the last time Chico saw her, Crystal knew he was taking the kids, and Crystal did not say anything.

In response to the final questions, Chico stated he is right-handed, Crystal shot guns frequently, and she had tried shooting with either hand. Crystal had complained to him about the "kick" of the .45 and wanted a smaller gun. Chico left the police station around noon on August 9, agreeing he would return to answer any additional questions. On the afternoon of August 9, the children were interviewed at a child protection center. Chico drove there separately.

Detective Derek Schwandt overheard him telling the children before the interview to be honest; he did not know if he would be able to see them again, and he loved them.

Officer Jeffrey Klein was stationed outside Crystal and Chico's house during the evening of August 9, 2012. During a heavy rain between 8:00 and 9:00 p.m., Klein observed a man wearing dress clothes, later identified as Chico, walking in the area of the garage.[10] As the man proceeded to walk past the house, Klein asked what he was doing. Chico replied he was walking for exercise and kept on walking. A few minutes later, Klein saw a beige SUV drive by and radioed for officers to stop Chico. When other officers pulled in behind the SUV, Chico pulled over and stopped. As the officers left their vehicles and approached, Chico drove off. The officers could not locate him. At trial, Chico testified about driving off after his walk in the pouring rain:

> I had just [gone] through a traumatic moment losing my wife and everything, and I didn't know what these people were going to do to me. I didn't go in the house. I wasn't on the property. I was out walking, trying to have connections to my wife and kids, and they pulled up out of nowhere on me. I didn't know if they were going to hurt me or what was going to happen, so I didn't stop for them.

Chico did not remain in Burlington but flew to the Seattle airport and then drove two and one-half hours to Lynsey Surridge's home, arriving in the early morning of August 11. He stayed there for several days. During his direct examination at trial, Chico did not mention Surridge, instead testifying he went to Washington to see some friends who had served in the service with him and also

---

[10] At trial, Chico testified he had parked his SUV a few blocks away at Grimes school before walking to his house.

to "have a ceremony done by some Indians; they're friends of mine, the First Nation." On cross-examination, Chico admitted Lynsey Surridge was the first person he went to see when he arrived in Washington. Chico also agreed he did not tell her about the incident until she saw the cut on his arm.

Surridge testified Chico initially was quiet and guarded and did not want to talk about the wound on his arm. His demeanor was different from the outgoing demeanor he displayed during their phone calls. Later in the visit, Chico told her that he had been arguing with a friend who was going to commit suicide and during the argument, he had been stabbed. Several weeks after Chico left Surridge's residence, detective Short called Surridge, asking her to go to a local police station for an interview. At this interview, Surridge was surprised to learn Chico had been married, he had children, and his wife was dead. When the interview ended, an angry Surridge called Chico, who responded he was working to provide for his kids because their mother is "no longer with us."

After leaving Surridge's residence, Chico moved around the country while working in the Dakotas, Michigan, and New York. Agent George spoke to Chico by phone on August 13 and requested another interview. During that call, Chico did not agree to another interview, stating he did not kill Crystal and his kids did not hear a gunshot. George described Chico as very upset, possibly suicidal, and paranoid. According to George, Chico feared he would be charged with a weapons violation and go to prison if he came in for an interview. George called Chico again on August 14 and August 27, but similarly, Chico would not agree to another interview.

**B. Criminal Trial.** Chico was charged with first-degree murder, and his two-and-one-half-week jury trial commenced in August 2013. The State called several witnesses who testified Crystal was a happy, outgoing person who had never discussed suicide or appeared suicidal. Additionally, the State called witnesses who explained Crystal's demeanor changed when she was with Chico. For example, co-worker Armstrong recalled approximately four times when "Crystal would come in on Sunday nights to get ready for inspection on Monday mornings, Chico would come in and watch her" for "the whole entire time she was there . . . approximately four to six hours." According to Armstrong, "Chico would stare at her. He would fold his arms. He would make her uncomfortable. He would come up to the counter staring at her. He would just sit in there and watch her, and he didn't look too happy while he was watching her." Armstrong observed a change in Crystal's demeanor when Chico was there, testifying if "it was just Crystal," she "was relaxed" but when Chico "was there, she'd tighten up and be defensive."[11]

Coworker and friend Jennifer Pope described Crystal as "happy and bubbly" when she was away from Chico but subdued in his presence. Crystal told Pope she was "terrified" of Chico.

Coworker and friend Margaret White testified Crystal was a sweet person—an "angel." White testified to Chico's controlling behavior, i.e., frequently calling and texting Crystal's cell phone while Crystal was working. He

---

[11] When Chico testified, he denied sitting in McDonald's for long periods of time, stating he only made "quick trips in and out" in order to "see Crystal or take my kids up there." One of Crystal's co-workers testified she had not observed Chico staying for that length of time.

would then call McDonald's if Crystal did not answer or text a response. During one such phone call between White and Chico, he accused White of lying about Crystal's whereabouts. Because this upset White, she programmed Chico's number into the phone and would not answer if he called. White also testified to observing Chico becoming upset when Crystal, performing her job, interviewed male job applicants for McDonalds. White described Crystal's state of mind about Chico as "in fear."

T.N. testified her mom and dad did not get along when her dad was home—they would "be arguing all the time" and she and N.N. would go upstairs. While upstairs, they could sometimes hear them arguing "if they're really loud," but sometimes they would not hear "because it's very weird up in that room." N.N. testified similarly, his parents argued "sometimes," and when they argued, he and T.N. would watch television in his room. Sometimes they could still hear them, depending on how loud they were arguing. In the past, both children had seen a gun near the bed in their parents' bedroom.

Thirty-nine-year-old Chico testified he did not touch the gun that evening and he did not shoot Crystal. He arrived home around 11:30 p.m. on August 8 and saw a tan Buick parked on the street "on our side of the road." He "thought it was the neighbor's car, because sometimes the neighbors would park on our side of the street." On cross-examination, Chico testified he did not think it was a neighbor's car because he had recognized the car but because of where the car was parked. We note that despite his alleged belief the car belonged to a neighbor, Chico did not immediately enter his house after his long drive:

> I pulled my truck in the garage; our garage door light will stay on until it shuts off. It has, like, a delay. So I waited for the light to go off, because I wanted to see who this person was, and my dome light went off in my truck, and I was still in the garage, so once that went off, I stood in the garage by my truck, and I watched this man leave my house, is what I did.

Once the man drove off, Chico exited the garage, unlocking the back door and entering the kitchen. He opened the doors leading upstairs from the kitchen to the children's bedrooms and between the kitchen and the dining room, noting Crystal was not in their bedroom. He put his phone and car keys on the entertainment stand as he walked "towards the front of the house where the porch is; my wife is there with a .45," a gun they owned because Crystal "wanted to feel protected." Crystal was standing and holding the gun because she had heard someone whistling. He and Crystal sat together on the porch with the gun resting between them and talked for ten to fifteen minutes.

> I didn't say [anything] to her at that point about who that man was. I just went in there, and I let her know I'm home early . . . . We talked about my blood clot in my leg, how was the drive. We talked about—we were going to get a divorce, and she had called me when I was in [Texas] and told me about it . . . so we had tried to work it out, and I was going to give her money for her own place, a deposit and rent, and I was going to get her a vehicle to drive that was hers, because she wanted her own vehicle, and we had talked about that, and that's what we were discussing, and she said she had paperwork that she wanted to show me, and I'm, like, okay.

After "we had our conversation," Chico went upstairs to take a shower. At some point Crystal came upstairs and talked to him while he was in the shower. Chico explained N.N. had heard him talking to Crystal in the bathroom, so after his shower, Chico wrapped himself in the green towel and went into N.N.'s bedroom to talk to him, stating, "I'm home early." He and Crystal walked down

the stairs together, and Crystal went to the porch to "finish tidying up" while he went to the bedroom to finish drying off.  Chico saw a note by the side of the hamper that "just seemed out of place" and started reading it.  When Crystal came to the bedroom with the gun, she saw him reading the note, and they had an "intense conversation" for fifteen to twenty minutes.  Chico admitted becoming upset after reading the note, he was "devastated" and "couldn't believe it."

> When I was reading the note to Crystal, Crystal stood toward the end of the bed . . . and I kept reading this to her, and she sat down on the bed next to me, and the gun would be next to her on the bed, because we were sitting looking at each other, and I couldn't believe that she wrote this note to this man.

Chico left the green towel on the bed and went to the kitchen, stating he "was naked this whole time."  Crystal left the gun in the bedroom, followed him, and tried to grab the three pages of notes from him: "I could tell [Crystal] was upset, and she stretched her fist out, and she made—she stretched her hand out and made a fist and put it to her side and walked to the kitchen with me, and she started washing the dishes."  He "continued to read the letter to Crystal" while she was doing the dishes and feeding the fish: "I read her words to her.  Plus, I had said what my feelings were about it, and [Crystal] had said more of, I'm not going to tell you about this; this has nothing to do with you."  Chico estimated they were in the kitchen "for twelve to fifteen minutes."

When Crystal left the kitchen for the bedroom, he followed, stood in the bedroom doorway, and saw Crystal sitting on the bed.  He offered to give Crystal one page of the note if she would identify the man in the note.  Chico gave Crystal one page, which she tore up.  He testified:

> When she tore that letter up, I wanted to take pictures of the two I had, so I was going to show her father . . . . I was naked. I didn't have any pockets for my phone, so I went to the entertainment stand and got my phone to take pictures of these letters, the last two that I had.

Crystal remained in the bedroom when he left to retrieve his phone. Chico did not take the pictures in the room where he had retrieved his phone; he testified he instead went back to the bedroom and sat down next to Crystal, who was sitting on the end of the bed. Only then did he

> try to take pictures with my phone. Crystal is trying to grab the letters as I'm taking pictures . . . . Now, she does this for a while, tries to get these from me, and the pictures I had . . . you could see my thumb in them. I wanted to have exactly what it said . . . so I left . . . set those on [the dining room] table and took better pictures of what I had took in the room.

While he was taking pictures in the dining room, Crystal remained in the bedroom and twice "said she's going to hurt herself" if he showed her father the pages. Chico replied he was going to show her father. He put his phone back on the entertainment stand, and Crystal called him to come back in to the bedroom. Chico returned and handed the two pages to Crystal, who was standing and who threw the pages on the bed before cutting his left arm twice with the knife in her right hand. She was holding the gun in her other hand—"and every time she came across, that gun raised up every time she swung her hand." After cutting him, Crystal sat down. He found clothes to wear while he told Crystal: "I'm going to tell your dad; I got pictures; I got proof of what you're doing; . . . I'm going to get my kids; I'm going to take them and I'm leaving."

Chico testified it did not take long for him to get the kids, N.N. was already awake, and he physically shook T.N. awake. While the children put their shoes

on in the kitchen, Chico left the kitchen to grab his "phone, keys, and the remote for the garage door opener" from the entertainment center. Crystal did not say anything to Chico; she just looked at him while he gathered the items. On cross-examination, Chico testified:

> Q. [From the upstairs bedroom area,] you can exit those [stairs] through the kitchen and backdoor, and the bedroom area where Crystal was would not be visible? A. No, it would not be visible.
> . . . .
> Q. Did she make any effort to call out to the kids at all. A. No, she didn't.
> Q. Did they make any effort to try to talk to her? A. No, they didn't.
> . . . .
> Q. And I just want to confirm that the last time you saw Crystal was when you left the house to go to the hospital? A. Last time I [saw] Crystal, I grabbed my phone, the remote, and my keys, and I looked in the bedroom and [saw] her sitting there on the bed, is the last time I [saw] her. Make sure you got that.
> Q. And she was alive. A. . . . Absolutely, she was alive.
> Q. Was the knife in her hand? A. She had the gun and a knife. Remember, she had two hands.
> . . . .
> Q. A woman you had just described as telling you she was threatening to kill herself? A. Yes.
> Q. And from there, you [left] for the hospital? A. Yes.

The prosecutor also asked Chico to provide an additional description of the man he saw leaving the house on August 8: "Q. Was he tall, thin, young, old? A. He could have been medium height, maybe 160, 170 pounds, somewhere in there maybe, maybe it was more. This was almost a year ago."

The jury found Chico guilty of first-degree murder; he now appeals.

## II. Standards of Review

As to the claim the State presented insufficient evidence to convict him, we will uphold a jury verdict if substantial evidence supports it. *State v. Cox*, 781

N.W.2d 757, 760 (Iowa 2010). "Evidence is substantial if it would convince a rational factfinder that the defendant is guilty beyond a reasonable doubt." *State v. Mitchell*, 568 N.W.2d 493, 502 (Iowa 1997). We view the record evidence and "legitimate inferences and presumptions that may fairly and reasonably be deduced from [it]" in the light most favorable to the State. *Id.* We recognize the jury is "free to reject certain evidence, and credit other evidence." *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006).

"[T]o the extent the defendant's challenge to a trial court ruling on the admissibility of evidence implicates the interpretation of a . . . rule of evidence, our review is for errors at law." *Cox*, 781 N.W.2d at 760. We review a district court's ruling regarding the admission of evidence for an abuse of discretion. *State v. Richards*, 809 N.W.2d 80, 89 (Iowa 2012). A court abuses its discretion when its ruling is based "on grounds or reasons clearly untenable or to an extent clearly unreasonable." *Cox*, 781 N.W.2d at 760.

We review de novo Chico's pro se challenges based on constitutional grounds. *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001).

### III. Sufficient Evidence

Chico contends the State offered insufficient evidence to allow a reasonable fact finder to conclude he committed murder in the first degree.[12] The State was required to prove Chico shot Crystal with a pistol, she died as a

---

[12] Chico raises this claim, alternatively, in the context of his trial counsel making an insufficient motion for judgment of acquittal. We assume error was preserved and address the merits of his sufficiency challenge.

result of the wound, he acted with malice, and his act was willful, premeditated, and with the specific intent to kill.

Our review of the record shows the State presented overwhelming evidence of guilt. The State's witnesses described Chico's controlling behavior during the marriage. Those witnesses explained how Crystal's demeanor changed when she was with Chico, and when she was not with him, Crystal was a happy, outgoing person. Crystal's family, an old friend, and several new friends and co-workers testified Crystal had not contemplated suicide. Crystal's mother testified Crystal was happy about reestablishing their relationship.

Chico's behavior was evasive, suggesting guilt. He drove his beige SUV directly to his house after telling the dispatcher he would go directly to the police station in a blue Chevrolet. After walking by his house "for exercise" in the pouring rain, Chico deliberately eluded the police when they stopped him.

Chico's statements reveal his guilty knowledge. At the house and before Chico was told Crystal had died, he insisted the house was "a crime scene." He also enlisted his children in verifying his story and in attempting to gain entry to the alleged "crime scene." Several times during the evening, Chico referenced "evidence," i.e., "the evidence will show" and "sometimes evidence is false" and also used the phrase "smoking gun" on several occasions. Finally, Chico's statements at the house as to why he did not call an ambulance infer guilt—because he was taking blood thinners, if he had waited for an ambulance to come and treat his cut, then there would be "two down." The only "two" Chico

could mean are Crystal, because he knew he had already shot her, and himself, due to his blood condition.

The jury could have concluded Chico's testimony was not credible in several regards. First, if Chico thought a neighbor's car was parked outside his house, why would he believe someone was *in his house* and wait in the garage to see *someone coming out* of his house? His descriptions of his early trip home show his "surprise" was not intended as a happy surprise for Crystal. Rather, suspecting infidelity, he intended to "catch" Crystal by returning home early.

Second, the jury could also have found not credible Chico's claim he and Crystal calmly talked about his blood clot and his trip and he did not confront her until he "happened to find" the letters. If a jealous and controlling Chico had, in fact, seen Crystal's lover leaving the house, Chico's past behavior shows he would have immediately confronted Crystal. Thus, Chico's description of "our conversation" suggests he concocted his story of a man leaving, resulting in Crystal and Chico talking calmly on the porch.

Third, Chico's claim he was merely exercising in the rain near his house could also have been found by the jury to be not credible, especially when combined with the facts he parked several blocks away and followed his "exercise" by tricking the police into stopping so he could drive off and elude them.

Fourth, the jury could have discounted Chico's testimony that Crystal, who had insisted on physical care during her meeting with the attorney, would allow a "devastated" Chico to take the children in their pajamas at "about 1:36" without

speaking to either him or the children. This conclusion is buttressed by the fact Chico told differing stories about their exit. At the house, he told the officers one of the kids had asked to say goodbye to mom; he did not allow it. At trial, he changed his story, testifying the kids had not made any effort to talk to Crystal.

Fifth, the jury could have disregarded Chico's testimony he, after fourteen years of marriage, did not know whether Crystal's dominant hand was right or left because he was on medication and also his testimony she shot with either hand a gun she could not even cock herself.

Sixth and finally as to credibility, the jury could have discredited Chico's statement Crystal tried to choke him when the parties first discussed a divorce two weeks prior to her death. Ron testified a happy Crystal picked up the kids and told him Chico had agreed to a divorce. The attorney Crystal consulted formed the impression Chico had acquiesced in the divorce. Chico's claim Crystal had assaulted him in the previous two weeks during their discussion of a divorce was clearly an effort by Chico to lend support to his current claim Crystal assaulted him with a knife.

In addition, a reasonable jury could recognize that Chico gave inconsistent statements. At the house, Chico first stated Crystal "snatched" or "took" the letters from him. While still at the house, he later told the officers he "gave" the letters to Crystal after reading them. At the house, Chico stated Crystal stood in the kitchen with her arms crossed, staring at him. During the immediately following interview with Short, Chico claimed Crystal was doing the dishes and feeding the fish. His story was also fluid as to whether Crystal followed him or he

followed her, whether he put his clothes on after the shower and before finding/reading the letters or after he had been cut, whether Crystal always had the gun with her, and whether Crystal got madder and madder as he read the letters or was calm because she was smoking marijuana.

Finally, although Chico presented scientific evidence to bolster his defense, the jury could have reasonably concluded (1) the State's scientific evidence clearly established Crystal did not commit suicide and (2) the State's scientific evidence clarified the weaknesses in Chico's scientific evidence.

**A. The State's Scientific Testimony**. DCI criminalists Amy Johnson and Sabrina Seehafer spent nearly eleven hours at the scene taking photographs and collecting evidence for testing, including the pieces of paper strewn about the bedroom floor and the gun found in Crystal's left hand (her non-dominant hand).[13] When the blanket on the floor next to Crystal's body was moved, a bullet fell out. It was later determined the bullet came from the gun Crystal held, and that gun contained an empty cartridge case that had failed to eject.

Seehafer performed DNA analysis on numerous items taken from the scene. She discovered the three blood stains on the green towel in the kitchen were Crystal's blood. The towel's fourth blood stain showed Crystal as the major contributor and an undetermined person as a minor contributor. Seehafer testified the blood stains on the note found in the kitchen matched Crystal's

---

[13] DCI fingerprint examiner Dennis Kern tested the gun and the kitchen note. He was unable to identify the fingerprints obtained.

blood.[14] All the blood on Crystal's clothing was her blood, and her blood was not found on Chico's clothing. Bloodstains, which matched Chico's, included a bloodstain inside the master bedroom, one just outside the master bedroom, and one on a lighting switch plate going upstairs.

Seehafer's examination of the knife found next to Crystal's body showed Crystal's DNA was not on the knife. Seehafer explained one would not necessarily find Crystal's DNA on the knife even if Crystal had used it to cut Chico. Seehafer also found no blood on the knife blade but noted skin may be cut once without a knife picking up any blood. Seehafer discovered "touch" DNA on both the knife's blade and handle matching Chico's DNA.

Seehafer also examined samples from the gun. A sample from the gun slide was inconclusive for blood but showed DNA matching Chico. The samples from the gun's grip/trigger/hammer matched Crystal's blood. Seehafer's testing of the swabs from the chairs on the sun porch showed DNA matching that of Joshua Patrick.

The Iowa DCI lab does not own a high-powered microscope and conducts a simple gunshot residue test for the presence of lead. Gunshot residue can be deposited by firing a gun, being near a fired gun, or from surface contact. DCI criminalist Victor Murillo tested for lead on both the green towel and Crystal's shirt and found no lead particles. Murillo testified the lack of residue on Crystal's

---

[14] DCI criminalist and forensic document examiner Gary Licht reconstructed the torn note. On one page Crystal had written her name multiple times with three different last names—Newman, Johnson, and Patrick. In another portion, Crystal had written she should stop seeing him, presumably Patrick, and she planned to move to Iowa City with her kids.

shirt did not mean she did not fire the weapon. Murillo also explained he "would never rely on a gunshot residue kit to solve a case" because the results are subject to several interpretations. Lieutenant Dennis Kramer testified problems such as false positives and inconclusive results occur in testing for gunshot residue. Murillo determined the pistol found in Crystal's left hand was in working order and had fired the shot that killed her. Murillo testified the gun's spring tension could be difficult for some people to operate. Murillo stated the gun would be "very loud" when fired.

DCI criminalist Michael Halverson trained in both DNA analysis and bloodstain pattern analysis (BPA), reviewed crime scene photographs, police reports, the pathology report, and the DNA reports. Halverson's analysis showed numerous *transfer* bloodstains on the back of Crystal's left hand, the floor under her hand, her left sleeve cuff, the left hand slide of the pistol, her left index finger, the towel, and the kitchen note. The only source of Crystal's bleeding was her head wound. Halverson opined the transfer stain on Crystal's hand "is not consistent with shooting herself" because her hand had to be in contact with liquid blood and liquid blood did not appear until after she was shot. Halverson doubted Crystal could have moved her hand into her blood because her injury would have left her incapable of making such a movement. Based on the transfer stains, Halverson opined Crystal's hand was moved after she lost consciousness or died. Halverson expressed the same opinion about the transfer stains on the floor below her hand and on her left sleeve.

As to the transfer stains on the slide of the gun and Crystal's finger, Halverson opined these stains were not consistent with a self-inflicted wound because (1) the transfer required liquid blood and (2) a self-inflicted wound would cause backspatter and there was no backspatter. As to the transfer stains on the towel and note found in the kitchen, Halvorson opined those two items were moved from the bedroom to the kitchen after Crystal started bleeding.

After analyzing the bloodstains on the side of the mattress, Halverson concluded the upper portions of the bloodstain came from projected blood while the lower portions of the bloodstain were a transfer stain. Thus, Crystal was not shot while sitting on the bed or standing next to it. Instead, the blood stains revealed it was likely Crystal was kneeling or sitting on the floor next to the bed when she was shot.

**B. Autopsy.** Dr. Firchau conducted the autopsy,[15] which showed marijuana in Crystal's system. During the autopsy, a piece of the note was discovered clenched in Crystal's fist. Dr. Firchau opined she died an instantaneous death from a single gunshot wound to her head. He described the path of the bullet—an entrance wound in the upper left-hand back portion of Crystal's head travelling in a downward trajectory from left to right, back to front. Based on his observations and experience, Dr. Firchau testified he would not expect Crystal to have made "any significant postmortem voluntary movements."

---

[15] Medical examiner Seth Eberhardt testified his preliminary finding listing Crystal's cause of death as suicide was based on the information he had been given and "from what I saw" at the house. He also explained it is not within his education/position to make a final determination on the cause of death; that is the purpose of the autopsy.

Dr. Firchau also opined Crystal did not suffer a contact wound, i.e., the gun was not directly contacting Crystal's skin or within one inch of her skin. Further, the entrance wound did not have the characteristics of an intermediate-range wound, i.e., a wound from a few inches to "a few feet from the head." Initially, Firchau classified the manner of death as undetermined, but upon reviewing Halverson's report, Firchau changed the manner of death to homicide.[16]

**C. Chico's Scientific Testimony.** Stephanie Horner from RJ Lee Group used an electron microscope to conduct gunshot residue testing on swabs from Chico's right hand and left forearm. Horner's testing showed no particles of gunshot residue. Horner acknowledged the absence of residue does not "eliminate the possibility that the subject handled or discharged a firearm" because there are numerous ways to remove the particles, for example, by hand washing, by the passage of time, by wiping your hands on your clothing, or by running your hands through your hair.

Julie Howenstine, an employee of Speckin Forensics who specializes in forensic biology and DNA analysis, also testified on Chico's behalf. After reviewing Halverson's report, Howenstine agreed "someone may have moved [Crystal's] hand, and so they would have had to grab somewhere on the cuff

---

[16] Based on Firchau's testimony, the prosecutor logically argued: "Common sense will tell you a woman is not going to fire a .45 caliber gun from back to front with her off hand [or left hand] from [far away.] Those are things we know from Dr. Firchau's testimony and from our common sense."

area."[17]   Believing Crystal's body had been moved; Howenstine swabbed the unstained, non-blood areas of Crystal's shirt cuff for touch DNA.   Howenstine sent the swabs to Elmer Otteson of GenQuest DNA Analysis, and Otteson extracted DNA.[18]   Howenstine testified Otteson's data on the cuff showed "a mixture of at least three individuals, and we were hoping still that we might find a sample where we had a single-source donor or a major-minor donor where we had better data to be able to compare to [the] reference samples" from Crystal, Chico, and Patrick.   Searching for "better data," Howenstine next "suggested another sample might be the towel," because "we might find some [non-Crystal] cellular material . . . and perhaps generate a DNA profile in that way from someone who had handled the towel."   Howenstine asked Otteson to test the towel "after we realized that we had a mixture" on the cuff.

When Otteson's DNA data on the towel "also indicated the presence of at least three individuals," Howenstine moved on to a third item for testing, the kitchen note "found removed from the body area."   Howenstine testified that, similar to the previous two samples, "the piece of the note found in the kitchen had a mixture of at least three people's DNA present."[19]   Although Otteson was not asked to interpret the profiles/data, he testified to the effects of complexity on DNA interpretation:

---

[17] Howenstine specifically testified the State's blood pattern analysis "showed several things, but the fact that the body had been moved is one of those conclusions."

[18] Otteson did not do any "preliminary testing to see what the DNA was . . . semen, or et cetera."

[19] Otteson's final report stated the samples were "a mixture.  It was consistent with three or more individuals," meaning it would take at least three people to produce the results obtained.

Q. Based on the three mixed profiles you obtained . . . had you been asked . . . would you have been able to include or exclude individuals from the profiles . . . ? A. It would have been difficult. I doubt it. Well, you can exclude somebody, but including them would have been difficult.

. . . .

Q [C]ould you put that in laymen's terms for the jury. A. Well, the profile that we got was very low, and it was right on the borderline of what you can believe to be accurate or not, so we got a lot of alleles, a lot of peaks, but they were right on the borderline of being able to believe them or not, so it wasn't a good profile, and it was a—quite a few different alleles, so you couldn't always trust what you got here.

Q. And so what I understand . . . is . . . you don't feel you would have been able to do an accurate interpretative analysis? A. Correct.

Howenstine conducted a "DNA interpretation" by comparing Otteson's data to known DNA samples from Chico, Crystal, and Patrick. Howenstine opined there was DNA from an unidentified fourth person in all three samples and also opined she could not *include* Chico, Crystal, or Patrick as possible donors to the DNA obtained from the left sleeve, towel, and note—"for a mixture like this, where there was no obvious major in any of these three samples, you would never say that you are matching anyone to it."[20] Howenstine concluded her testimony by discussing the *exclusion* of donors, stating:

Q. [What] you have said here is that after your analysis, you [conclude] that Chico Newman, Crystal Newman, and Joshua Patrick could not be excluded as donors of the DNA? A. That's correct . . . . I was not able to exclude them, but I won't make the statement they are not excluded as possible donors either, because basically, the result would be called inconclusive. I can neither associate them to the sample nor exclude them from the sample.

---

[20] Howenstine also testified: "[T]he only sample where I was fairly confident at least one of these three reference samples was present was in the swab of Crystal Newman's left cuff, and it was consistent with coming from Crystal Newman."

On cross-examination, Howenstine again testified, "with regard to all three of the samples [sleeve, towel, note], they were all, essentially, just inconclusive." Further, in part due to the fact Howenstine was working with a "complex mixture," she could not "give a statistical frequency, which is scientific certainty, to the fact Joshua Patrick was included" on the sleeve, on the towel or on the note. Howenstine testified she did not disagree with the DNA analysis and findings of the Iowa Department of Criminal Investigation. Finally, Howenstine had reviewed Halverson's report, and she did not disagree with any of his conclusions or findings.

**D. State's Rebuttal of Chico's Scientific Testimony.** DNA analyst Seehafer reviewed Otteson and Howenstine's testing and analysis. Seehafer noted she did not test the same regions because "I didn't test the unstained portions." Other than the fact Otteson used a testing kit designed for paternity cases and not one validated for use in forensic science laboratories, Seehafer opined Otteson's "review of the data stating that all three samples were a mixture of three or more [persons] was scientifically sound."

As to Howenstine's interpretation of Otteson's data, Seehafer testified, under her lab procedures, she would not have been able to conduct an interpretation on these profile mixtures. Specifically, "all the mixtures indicated to me a four-person mixture. By our guidelines, we are not allowed to interpret a four-person mixture. Every time you have an additional contributor to the DNA profile, it increases the complexity of being able to sort out whose DNA is actually in that mixture." Therefore, in the Iowa DCI laboratory, the mixtures "would be

called too complex and too weak for conclusive interpretation" and "those profiles would have been listed as uninterpretable." Seehafer also testified that Howenstine opining as to Joshua Patrick's DNA without providing any statistics is meaningless information. We observe the fact Howenstine continued to test and search for items with a major/minor contributor supports Seehafer's conclusions.

**E. Conclusion on the Sufficiency Challenge.** Based on the totality of the evidence viewed in the light most favorable to the State, a rational jury could conclude Howenstine's interpretive analysis of the non-blood, touch DNA was, in her own words, "inconclusive" and not entitled to any weight. The record shows a jealous, controlling Chico suspected Crystal was having an affair and knew she wanted a divorce. The parties fought frequently when Chico was home, and their marriage was so unhappy that they both sought the companionship of others. Crystal was not suicidal and was happy about the prospect of divorcing Chico and reasserting control over her life, including reestablishing a relationship with her mother.

Even setting aside the credibility issues with Chico's testimony discussed above, based on Halverson's *undisputed* analysis of the physical evidence, overwhelming physical evidence shows Crystal did not commit suicide—decimating the primary trial defense. A jury could reasonably conclude Chico, having previously threatened "there would be consequences," made good on his threat after he "found" the letter by (1) standing above Crystal as she knelt to pick

up pieces of the torn note[21] and (2) using Crystal's bedroom gun, shot her in the upper-left-back portion of her head, causing a downward, non-contact, non-intermediate entry wound. A reasonable jury could further conclude Chico carelessly placed the gun in Crystal's *non-dominate left hand* to stage a suicide scene, leaving damning touch DNA on both her hand and the floor, and cut himself, leaving his touch DNA on the knife, before he rushed to the hospital to plant the Crystal-suicide story. The record shows that in his rush to leave, although Chico took time to use the key to lock the kitchen door, he mistakenly left the towel and note containing Crystal's blood on the kitchen counter, items Crystal absolutely could not have moved to the kitchen herself after firing the gunshot that killed her instantly.

In sum, Crystal's death occurred two weeks after Crystal told Chico she wanted to leave him and immediately after Chico, a controlling spouse, arrived home early, found a note confirming his suspicions of her infidelity, and the parties fought. No one else had a motive to kill Crystal, who was "afraid" and "terrified" of her husband. The jury was free to accept or reject Chico's testimony, as well as the other witness's testimony. Clearly, the jury did not find his claim Crystal committed suicide credible.

Likewise, the jury did not believe Chico's alternative claim—Joshua Patrick, after receiving an earlier text message telling him not to come, for some reason came to the house anyway and just happened to come after Chico left with the kids at 1:36 a.m. For some unknown reason, Patrick killed Crystal

---

[21] As discussed earlier, during the autopsy, a piece of the note was discovered clenched in Crystal's fist.

during the approximately forty-five minutes after Chico left and before the officers arrived for the welfare check Chico himself initiated. When the officers arrived, both doors were locked with deadbolts, and there is no evidence Patrick had a key to lock the kitchen door after his alleged shooting of Crystal. Neither is there any evidence Patrick drove an old Buick. It is undisputed *Chico* used a key to lock the kitchen door when he left that evening. Thus, Chico's claim, if Crystal did not commit suicide, Joshua Patrick shot her, is inherently unbelievable. Based on our review of the evidence in the record, we conclude overwhelming evidence supports the first-degree murder conviction.

## IV. Officer's Testimony to Personal Experiences at Suicide Scenes

During the State's case-in-chief, the prosecutor asked four investigating officers, Gerdner, Venvertloh, Sandu, and Kramer, to testify to their anecdotal experiences at suicide scenes. Defense counsel's relevancy objections were overruled.[22] On appeal, Chico claims the anecdotal testimony "involved probabilities regarding the general population that were not relevant to [his] case."

Generally, evidence "is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Reynolds*, 765 N.W.2d 283, 290 (Iowa 2009). We set out the testimony in the order it was presented to the jury.

---

[22] Chico's counsel objected to some but not all of this testimony on relevancy grounds. Our analysis and conclusion does not require us to differentiate between the objected-to testimony and the un-objected-to testimony.

Officer Gerdner testified he had observed "six or so" suicide scenes involving firearms and he could not "say for sure" how many of those six scenes involved women, but "I know it was one just a year ago prior to this." Officer Venvertloh testified similarly, of his four or five calls to suicide scenes involving firearms, "there was only one involving a woman using a firearm." Venvertloh recalled the address of the female suicide because it was "different from the others . . . . It was a female involved." "Q. And that was unusual? A. Yes. Normally, it has been my experience that females—I don't recall any other ones using a firearm." DCI agent Sandu testified he had been called to ten suicide scenes involving firearms, only one was a woman, and she had used a handgun. During cross-examination, Sandu also testified that when he observed Crystal's body, "nothing came to [his] attention" and he did not think anything was "unusual."

Officer Kramer was the final witness to testify, stating he and Sandu entered the residence, got a layout of the house itself, "and kind of looked at what evidence we felt would be necessary to notify the criminalists about."

> Q. What sorts of things stood out to you that were things of interest? A. Things of interest to me, first off, was the body itself was a female, of course, and typically from the past in some training I've received is it is uncommon for, I guess, females to commit suicide by shooting themselves in the face or in the head area, because they have sometimes have thoughts of . . . .
> DEFENSE COUNSEL: I'm going to object. I believe he has answered the question. I don't believe he is qualified to give this expert testimony as he wants to give either.
> THE COURT: It is a narrative answer so ask another question.
> Q. . . . [T]he way I understand your answer was that it was just uncommon to find a female who would commit suicide using a firearm? A. Yes.

Q. And I believe you said, specifically, to the head area? A. Yes.

Kramer testified he had responded to fifty suicide scenes involving firearms and "I can't remember any that I had responded to that would have involved a woman and a firearm." "Q. So was it that experience that you were referring to that drew your attention to the fact that this was a female with a firearm? A. Yes."

Chico contends the witnesses' anecdotal testimony implied that because it is "so rare" for a woman "to commit suicide by the use of a firearm, the likelihood that Crystal committed suicide was nil." He claims this evidence led the jury to assume women do not commit suicide using firearms and allowed the jury to convict him "on probabilities rather than the evidence presented against him as an individual."[23]

The State responds such evidence "was relevant, proper lay opinion testimony, and in any regard, not prejudicial." The State claims the officers limited their testimony "to each officer's work experience, and none gave a personal opinion on the appearance" of the "shooting scene or an opinion on Chico's guilt." Finally, the State claims the challenged testimony was harmless in light of the strong evidence of guilt. In support, the State cites an unpublished California case in which the husband presented a suicide defense. *See People v. Branch*, No. A113421, 2007 WL 4171625 (Cal. Ct. App. Nov. 27, 2007).[24] One

---

[23] Chico also claims the anecdotal evidence was "not consistent with reality" and compares Gerdner, one woman out of six (16%), and Venvertloh, one woman out of five (20%), with two studies detailing suicide statistics. Based on our conclusion to Chico's relevancy challenge, we need not discuss the accuracy of the testimony.

[24] The State also cites a postconviction (PCR) case from Delaware in which the husband sought relief from his first-degree murder conviction for killing his wife by a gunshot to

investigating officer testified, upon viewing the scene "he became somewhat suspicious because out of the many suicides involving females that he had worked, there had always been a suicide note and only two of the women had used a gun to kill themselves." *Id.* at *1. The appellate court allowed the testimony:

> [W]e cannot say [the officer's] testimony regarding his experience with female suicides lacked a rational basis, or that it failed to clarify his testimony. The testimony was helpful to the jury insofar as it was relevant to show why the officers might have been disposed to fully investigate [the wife's] death, rather than simply closing the case as a suicide. Moreover, it is common knowledge that police officers are trained to assess potential crime scenes and that they often rely on their past experience in deciding whether further investigation is warranted.

*Id.* at *3.

We do not find the State's case law persuasive; only one officer testified, and he clearly tied his testimony to his ongoing investigative analysis. *See id.* at *1. Here, the State presented anecdotal testimony from four different officers, asked the jury to rely on the anecdotal evidence during closing arguments,[25] and only Kramer's testimony could arguably be tied to his investigative analysis. Accordingly, we conclude the anecdotal evidence herein was not relevant. We

---

the head. *See State v. Ploof*, No. 111003002, 2012 WL 1413483 (Del. Super. Ct. Jan. 30, 2012). At the criminal trial, the state medical examiner testified "cases of female suicide by firearm are very rare and . . . in her opinion, [the wife] was the victim of a homicide." *Id.* at *2. Because this case does not involve a challenge to the medical examiner's testimony, this case is not helpful to our resolution of Chico's appeal.

[25] The prosecutor relied on the anecdotal evidence during closing:

> And another question I think you should all ask yourself, this is a gun that Mr. Newman . . . talked about [with detective Short,] she didn't like the kick of a .45. We heard several law enforcement officers who have been to suicide scenes involving firearms testify, A, it's very rare to have a woman shoot herself, and even more rare for the gun to still be in her hand.

also conclude the evidence was prejudicial to defense counsel's efforts to establish the primary defense of Crystal committing suicide.

Although the anecdotal stories were erroneously admitted into evidence, the circumstances of this case nevertheless reveal the admission to be harmless error. *See* Iowa R. Evid. 5.103(a) ("Error may not be predicated upon a ruling [admitting] evidence unless a substantial right of the defendant is affected."). Because the evidentiary error was not of constitutional dimensions, we reverse only when it appears Chico's rights "have been injuriously affected by the error or that he has suffered a miscarriage of justice*." See State v. Henderson*, 696 N.W.2d 5, 12 (Iowa 2005). The State presented overwhelming proof of guilt, as detailed above. No purpose would be served by repeating our analysis. In short, we are confident the State's case on the first-degree murder charge was so overwhelming that the State would have prevailed in the absence of the officers' anecdotal evidence.

## V. Pro Se Claims

We find no merit to Chico's claim defense counsel was ineffective in failing to object to a "general intent" jury instruction. Jury instructions are to be read together, and the marshalling instruction clearly required the State to prove Chico acted with the specific intent to kill Crystal. *See State v. Pierce*, 287 N.W.2d 570, 575 (Iowa 1980); *see also State v. Keeton*, 710 N.W.2d 531, 534 (Iowa 2006). Furthermore, Chico's defense was that he did not shoot Crystal, claiming either Crystal committed suicide or Joshua Patrick shot her. Chico did not defend on

the basis he lacked the specific intent to kill Crystal. Accordingly, defense counsel was not ineffective on either duty or prejudice grounds.

Second, Chico claims trial counsel was ineffective by failing to object to some elements and wording in the lesser-included-offense instructions. Because the jury found him guilty of the greater offense, he has failed to establish either a breach of duty or resulting prejudice based on the lesser-offense instructions.

Finally, Chico claims trial counsel was ineffective in failing to move to suppress his police-interview statements at the police station based on an alleged lack of *Miranda* warnings during the unrecorded portion of his interview. Finding the present record inadequate to resolve this claim, we preserve it for possible postconviction-relief proceedings.

We have considered all the claims presented; any claim not specifically addressed is deemed to be without merit.

**AFFIRMED.**